1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF NAHAL CONNIE DADKHAH, by and through her successor-in-interest, MANOUCHEHR DADKHAH, and JALEH MOHAMMADZADEH individually and in his capacity as successor-in-interest,

Plaintiffs,

v.

CITY OF SAN DIEGO, et al.,

Defendants.

Case No.:  3:24-cv-00097-RBM-DDL

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**[Doc. 17]**

This case concerns the San Diego Police Department's ("SDPD") response to the events preceding the death of Nahal Connie Dadkhah ("Connie") on June 14, 2022. Pending before the Court is Defendant City of San Diego's ("Defendant CSD" or the "City") Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion"). (Doc. 17-1.) Plaintiffs Estate of Nahal Connie Dadkhah ("Plaintiff Estate"), Manouchehr Dadkhah, and Jaleh Mohammadzadeh (collectively, "Plaintiffs") filed an Opposition to the Motion ("Opposition"). (Doc. 18.) Defendant CSD filed a Reply ("Reply"). (Doc. 19.)

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, Defendant CSD's Motion is **<u>GRANTED</u>**.

# I.  **BACKGROUND**

Defendants previously filed a Motion to Dismiss Plaintiffs' initial Complaint.  (Doc. 7.)  On July 3, 2024, this Court granted Defendants' Motion to Dismiss in its entirety and allowed Plaintiffs leave to amend (the "MTD Order").  (Doc. 10.)  Plaintiffs subsequently filed the First Amended Complaint ("FAC").  (Doc. 15.)  The facts and claims alleged in the FAC are as follows.

## A.  **Pre-Incident**

Connie was a medical research assistant and production manager who volunteered at a local mental health outreach center in her free time.  (FAC ¶ 3.)[1]  She lived in an apartment on the second floor of a two-story condominium located in the City of San Diego.  (*Id.* ¶ 37.)

For two years preceding the incident, police had responded to several incidents at Connie's apartment involving prior instances of violence, stalking, and abuse toward Connie by a man named Parrish Chambers ("Chambers").  (*Id.* ¶ 60.)  On November 2, 2021, Chambers reportedly dragged Connie by her hair into her SUV and drove away.  (*Id.* ¶ 61.)  On April 22, 2022, Chambers reportedly showed up to Connie's apartment and yelled at, grabbed, pulled, and punched Connie.  (*Id.* ¶ 62.)  The information from that incident indicated Connie was visibly injured and Chambers did not live with Connie.  (*Id.*)  After this incident, Plaintiffs allege that officers were instructed to send at least 3 officers, a sergeant, and a K-9 unit if a call for service was made for Connie's address.  (*Id.* ¶ 63.)

Plaintiffs provide additional allegations concerning previous incidents witnessed by Sara Shirazi ("Shirazi"), who resides in a unit right below Connie's apartment, and Kiriaki Souder ("Souder"), a neighbor who lives in the same building.  (*See id.* ¶¶ 46, 48.)  Shirazi had seen Chambers stalking Connie, yelling at her, climbing her balcony, pushing and hurting Connie on a recurring basis since she moved to the building eight months prior.

---

[1] The Court cites the paragraph numbers of the Complaint and the CM/ECF electronic pagination for other citations unless otherwise noted.

(*Id.* ¶ 46.) Souder reported Chambers to the police a few months prior to Connie's murder. (*Id.* ¶ 48.) Like Shirazi, Souder had seen Chambers be violent and threatening towards Connie. (*Id.*) Specifically, Souder had witnessed Chambers try to choke Connie. (*Id.*)

On information and belief, the SDPD officers who responded to the scene of the disturbance (the "Doe Officers"), and the SDPD Employees, including the SDPD dispatch unit, who were responsible for providing information to Doe Officers and aiding in their response on June 14, 2022 (the "Doe Employees") had actual or constructive possession of information of these incidents, Chambers' criminal record, and that he was ordered to stay away from Connie as a condition of his probation. (*Id.* ¶ 64.)

**B.  Incident**

"On June 14, 2022, at approximately 4:00 p.m., Connie's neighbors observed an agitated man, [ ] Chambers, on the stairs outside of Connie's unit. Chambers was yelling and rambling. Neighbors recognized Chambers from prior incidents." (*Id.* ¶ 38.) Neighbors observed Chambers outside for hours angry, yelling aggressively, and appearing highly agitated. (*Id.* ¶ 49.)

**1.    Calls for Emergency Services**

Plaintiffs provide additional allegations in the FAC that at approximately 6:59 p.m., Shirazi called the police after she heard yelling and loud music right outside her unit. (*Id.* ¶¶ 40–41.) Shirazi reported that she heard Chambers walking up the stairs towards Connie's apartment and that he seemed to be very angry and agitated. (*Id.* ¶ 43.) She stated that he was holding a bottle of vodka, yelling at people, and appeared to be drunk. (*Id.* ¶ 44.) She asked the police to arrest Chambers because he was causing a disturbance and she was afraid for herself and Connie. (*Id.* ¶ 45.)

"At approximately 7:00 p.m., at least two of Connie's neighbors called the police to report to Doe Employees that Chambers was banging on Connie's door and screaming. On information and belief, no officers were dispatched." (*Id.* ¶ 49.) These neighbors did not act further because dispatch told them help was on the way. (*Id.* ¶ 50.) Between 7:00 to 8:00 p.m., individuals made approximately five additional calls to police warning the Doe

3

Employees about Chambers being outside of Connie's apartment, but upon information and belief, officers were not dispatched. (*Id.* ¶ 53.)

Plaintiffs add the following allegations to the FAC concerning reports from Connie's neighbors including Shirazi, Souder, and Kevin McPhee ("McPhee"). (*Id.* ¶¶ 40–48, 51–52, 54–55, 57–62, 64–66.) Souder "saw Chambers at approximately 7:30 p.m., appeared violent and out of control and heard him saying 'They're going to lock me up. I'm going to go to jail. I'm going to hurt you.' 'Is that what you want?' 'Is that really what you want?' Souder called the police." (*Id.* ¶ 51.) Shirazi called the police again at 7:32 p.m. and at 7:51 p.m.. (*Id.* ¶¶ 52, 54.) At 7:51 p.m., Shirazi reported that Chambers was very agitated and was yelling into her home surveillance camera. (*Id.* ¶ 54.) She also reported that Chambers walked over and yelled into the neighbor's bedroom window while "still holding the bottle of vodka." (*Id.*) Shirazi watched the live footage from her home surveillance camera and informed the Doe Employee that she heard Chambers "yelling things like 'fuck you' [and] 'bitch' for about an hour or so." (*Id.* ¶ 55.)

At 7:00 p.m., a separate neighbor, McPhee "who has a direct view of Connie's balcony, heard a man yelling in the courtyard. McPhee was concerned so he periodically started looking out of his apartment to see if everything was okay but could not see a person." (*Id.* ¶ 48.) He called the police at 8:01 p.m. "for help because it was too much to ignore, it was not normal, dangerous, [and] he had to help stop it." (*Id.* ¶ 60.) McPhee reported that "he saw Chambers climbing the stairs leading up to Connie's apartment, go on the landing, climb over a cement barrier, grab on to a wall to traverse across the wall on to the balcony of Connie's unit . . . pound[ ] on the sliding-glass door, break the glass and enter the apartment." (*Id.* ¶ 59.)

At 8:03 p.m., a different neighbor called 911 and reported a break-in. (*Id.* ¶ 61.) She provided a description and "said she watched [a] man jump on the patio, bust the arcadian door and run in." (*Id.*) The neighbor also reported that he was carrying a bottle, that she had not seen the man leave since he went inside Connie's apartment, that he had been walking around for the past 30–35 minutes, and that she saw movement in the living room.

(*Id.*)  A Doe Employee informed her that they had already received another call "but confirmed that it was the door to her complex and she said yes." (*Id.*)  Based on the call transcript, Plaintiffs believe the dispatcher's name might be "Robertata." (*Id.* at n.3.)  The Doe Employee upgraded the call to a high priority. (*Id.* ¶ 63.)

"The police called Shirazi at 8:22 p.m., and she reported she was extremely concerned about Connie's safety and what was going on in her apartment." (*Id.* ¶ 64.)  At 8:41 p.m., another neighbor called the 911 emergency line after having allegedly called 30 minutes prior. (*Id.* ¶ 65.)  "[The] Doe Employee informed the neighbor that the units were already sent and asked the neighbor if she had additional information to share with the officers." (*Id.*)  The neighbor said she called again because "she didn't see any units at all, and she had been watching through the window and wanted to make sure everything was taken care of." (*Id.*)  "The Doe Employee assured the neighbor that the police would be making contact shortly and they would have a lot of units coming." (*Id.*)  The Doe Employee also upgraded this neighbor's call to a high priority. (*Id.* ¶ 66.)

### 2.  Police Arrival

At around 8:51 p.m., the Doe Officers showed up with guns drawn, called out on a microphone for individuals to come out of Connie's apartment, and knocked on Connie's door. (*Id.* ¶ 67.)  "Uniformed and armed officers, patrol cars, and amplified public announcements communicated to neighbors that the police were there to help Connie and they should not enter the apartment themselves to try and save her." (*Id.* ¶¶ 68–69.)  Shirazi told at least one Doe Officer that Connie was home, that a man broke into her apartment, and that she had seen Chambers assault Connie on previous occasions. (*Id.* ¶ 70.)  She also showed him the broken glass from the apartment.  The Doe Officers called Connie's phone but received no answer. (*Id.* ¶ 72.)  On information and belief, the Doe Officers were outside of Connie's apartment for about 15 minutes and then left. (*Id.* ¶ 72.)

### 3.  After Police Departure

Plaintiffs add to the FAC that "Shirazi called the police again at 9:19 p.m. and reported to Doe Employee her concern for Connie and asked for police assistance." (*Id.*

¶ 73.)  At 11:36 p.m., a different neighbor called the police again and reported that "she was very concerned for her and her children's safety because the police came and just knocked on the door, but . . . he was still inside." (*Id.* ¶ 74.)  After the Doe Employee explained they needed probable cause to enter the home, the neighbor reported that she witnessed Chambers break down a glass arcadian door to get inside and that she knew he was still there. (*Id.* ¶ 75.)  Although the neighbor requested that police be sent to the scene, "[o]n information and belief, no officers ever came to the scene or called back the neighbor." (*Id.*)

"On the morning of June 15, 2022, Doe Officers returned to Connie's apartment after they received a call from a neighbor who was told by Chambers to call the police because Connie was cold." (*Id.* ¶ 76.)  At approximately 8:20 a.m., Eva Santillan, a paramedic with San Diego Fire Rescue Department, arrived at the condominium complex" and determined Connie was deceased. (*Id.* ¶¶ 77, 82.)

## C.    High Priority Calls

According to SDPD's Communications Division Priority System, priority one calls like Connie's should be "dispatch[ed] immediately." (*Id.* ¶ 100 (footnote omitted).) "Priority one calls involve serious crimes in progress or a threat to life, including missing children, child abuse, domestic violence, disturbances involving weapons/violence and bomb threats." (*Id.* ¶ 101.)  For the past five years, SDPD has failed to meet its public safety standards and key performance indicators for priority one calls. (*Id.* ¶ 102.)  In 2022, SDPD and Defendant CSD's average response time target for priority one calls was 14 minutes, but the actual average response time was 36.8 minutes. (*Id.* ¶ 103 (footnote omitted).)  Chief Nisleit acknowledged SDPD deficiencies in a memorandum issued two months after Connie's murder. (*Id.* ¶ 104 (footnote omitted).)

## D.    Training

"Despite knowledge of the danger longer response times create, the importance of information sharing, and effective and accurate communication," Defendant CSD, Chief Nisleit, and the SDPD supervisor officers (the "Doe Supervisors") had "insufficient and

ineffectual policies, procedures, training, and supervision in place to have addressed this foreseeable and preventable harm, and/or their training of its officers to prevent the negligence and constitutional violations that occurred here was deficient." (*Id.* ¶ 105.) Moreover, "[d]espite actual and constructive knowledge of the risks posed by [stalkers] like [Chambers]," Defendant CSD and the Doe Supervisors had insufficient and ineffectual policies, procedures, communication, training, and supervision in place to ensure victims like Connie are protected from their abusers. (*Id.* ¶ 106.)

**E.    Legal Claims**

Plaintiffs Manouchehr Dadkhah ("Plaintiff Dadkhah") and Jaleh Mohammadzadeh ("Plaintiff Mohammadzadeh"), Connie's parents, bring claims against Defendants for:

- municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978), against Defendant CSD and the Doe Supervisors;

- violation of Plaintiff Dadkah's constitutional right of familial companionship under 42 U.S.C. § 1983 against the Doe Officers and the Doe Employees;

- violation of Connie's constitutional rights under 42 U.S.C. § 1983 against the Doe Officers and the Doe Employees;

- negligence against all Defendants; and

- violation of the Tom Bane Civil Rights Act, California Civil Code § 52.1 ("Bane Act") against Defendant CSD, the Doe Officers, and the Doe Employees.

## II.    <u>LEGAL STANDARD</u>

A motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim upon which relief can be granted "tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). An action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  For purposes of ruling on Rule 12(b)(6) motions, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## III.   DISCUSSION

Defendants move to dismiss the FAC in its entirety.  Defendants argue that Plaintiffs' Fourteenth Amendment claims against the Doe Officers and Doe Employees (collectively, the "Doe Defendants") fail because Plaintiffs' allegations do not support the application of the state-created danger doctrine.  (*See* Doc. 17-1 at 12–18.)  Likewise, Defendants argue that Plaintiffs do not state a *Monell* claim against Defendant CSD and the Doe Supervisors because Plaintiffs fail to allege an underlying constitutional violation. (*Id*. at 11–20.)  Finally, as to Plaintiffs' state law claims for common law negligence and violations of the Bane Act, Defendants argue that they did not have a duty to protect Connie under the special relationship exception and that they are immune from liability in this context.  (*Id*. 20–29.)  The Court addresses each argument in turn.

### A.   Fourteenth Amendment Claims (Second and Third Causes of Action)

Plaintiffs assert two causes of action pursuant to 42 U.S.C. § 1983 against the Doe Defendants for violation of Connie's Fourteenth Amendment due process rights under the state-created danger doctrine (Third Cause of Action) and violation of Plaintiff Dadkah's Fourteenth Amendment right to companionship and society with his daughter (Second Cause of Action).  (FAC ¶¶ 125–32, 133–39.)[2]

---

[2] Because Plaintiff Dadkah's claim is "integrally predicated upon" the same allegedly unconstitutional conduct by the Doe Defendants against Connie, the Court analyzes the Second and Third Causes of Action together.  *See Robbins v. City of Hanford*, Nos. CIV F F 04-6672 AWI SMS, CV F 05-0147 OWW SMS, 2006 WL 1716220, at *14 (E.D. Cal. June 19, 2006).

3:24-cv-00097-RBM-DDL

"The Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989*)*). In that vein, the Fourteenth Amendment "does not impose a duty on [the state] to protect individuals from third parties." *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007). An exception to this general rule includes, as relevant here, the state-created danger doctrine. For the state-created danger doctrine to apply, a plaintiff must establish that: (1) an officer's affirmative acts created or exposed the plaintiff to an "actual, particularized danger" that she would not have otherwise faced, (2) the injury suffered was "foreseeable," and (3) the officers were "deliberately indifferent to the known danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019).

In the FAC, Plaintiffs re-allege several inactions by the Doe Defendants including their failure to timely respond in an effective manner, their failure to communicate available information about prior instances of violence and abuse, the Doe Employees' failure to timely dispatch officers to the scene, and the Doe Officers' failure to ensure Connie was okay (FAC ¶¶ 17, 19–20). As the Court explained in the MTD Order, failing to act and merely knowing a potential danger exists does not amount to state-created danger. (*See* Doc. 10 at 15). Plaintiffs also re-allege that the Doe Defendants' acted affirmatively by "assuring concerned neighbors and citizens that they would respond[,] lulling [them] into relying on those representations[,]" "preventing [them] from entering Connie's apartment[,] and preventing them from trying to save her or render aid to her themselves." (FAC ¶¶ 88–89.)[3] Plaintiffs allege that Defendants committed such acts "with deliberate indifference and both objective and subjective knowledge and disregard of the known and obvious dangers posed by" Chambers. (*Id.* ¶ 128.) In support, Plaintiffs

---

[3] In doing so, Plaintiffs challenge the same actions that this Court already determined did not affirmatively place Connie in increased danger.

have added factual allegations identifying specific neighbors and detailing their accounts of the incident.  (*See, e.g.*, *id.* ¶¶ 40–48, 51–52, 54–66, 73–85.)

The Court considers Plaintiffs' allegations in the FAC and addresses each element of the state-created danger doctrine in turn.

### 1.    Affirmative Conduct

Plaintiffs "must [first] establish that the officer's *affirmative* conduct exposed the plaintiff 'to a foreseeable danger that she would not otherwise have faced.'" *Est. of Soakai v. Abdelaziz*, 137 F.4th 969, 982 (9th Cir. 2025) (quoting *Martinez v. High*, 91 F.4th 1022, 1028 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 547 (2024)) (emphasis in original).  To satisfy the first requirement, "Plaintiffs must plausibly allege that Defendants' affirmative actions (1) placed [Connie] in a worse position than [she] would have occupied had Defendants not acted at all; (2) created or exposed [Connie] to an actual and particularized danger; and (3) resulted in foreseeable harm to [Connie]." *Id*. at 983 (citing *Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023)).  The relevant question is whether a state actor's "*active participation* in the incident" created or "exposed the plaintiff to danger that [she] would not have faced had" the state actor not intervened.  *Id*. (emphasis in original) (quoting *Bracken v. Okura*, 869 F.3d 771, 778–79 (9th Cir. 2017)).  "Simply failing to prevent acts of a private party is insufficient to establish liability." *Martinez*, 943 F.3d at 1271.

"Impeding access to medical care amounts to leaving a victim in a more dangerous situation." *Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013) (citing *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)).  Indeed, the Ninth Circuit has "applied the state-created danger exception in situations where an officer abandoned the plaintiff in a dangerous situation, separated the plaintiff from a third-party who may have offered assistance, or prevented other individuals from rendering assistance to the plaintiff." *Murguia v. Langdon*, 61 F.4th 1096, 1112 (9th Cir. 2023).  For example, Plaintiffs cite to *Penilla*, where the Ninth Circuit held the officers' acts "clearly placed [an individual] in a more dangerous position than the one in which they found him" when they responded to several 911 calls about the individual, "examined him, found him to be in

10

grave need of medical care, canceled the request for paramedics . . . moved him inside the house, locked the door, and left." 115 F.3d at 708–10. Such acts made "it impossible for anyone to provide emergency medical care" to the individual. *Id*. at 710.

However, the Ninth Circuit has declined to apply the state created danger doctrine in similar situations where "the probability that the officers' conduct made [the victim] worse off [was] extremely speculative." *Est. of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1089–91 (9th Cir. 2001). In *Estate of Amos*, the officers halted civilian efforts to search for the victim of a car accident, who had wandered off into the desert, and later called off their own search. *Id*. No subsequent search was conducted until over a month later and the victim's body was not discovered until three years later. *Id*. at 1089. The Ninth Circuit held that, while the officers may have been aware of the dangers the victim faced, they did not create or greatly increase his risk of danger by instructing civilians to leave the accident site. *Id*. at 1091 (quoting *DeShaney*, 489 U.S. at 201). The court reasoned "the probability that the officers' conduct made [the victim] worse off [was] extremely speculative" because the victim's location and the extent of his injuries were unknown, the civilians' search efforts were minimal, and the civilians were not alleged to possess "special safety training or skills." *Id*. at 1092.

In this case, Plaintiffs claim the Doe Defendants "created a dangerous situation by assuring concerned neighbors and citizens that they would respond" thereby "preventing [such individuals] from entering Connie's apartment and . . . trying to save her or render aid to her themselves." (FAC ¶¶ 88–89.) The Court finds Plaintiffs' allegations do not show "above the speculation level," *Twombly*, 550 U.S. at 555, that the Doe Defendants' actions affirmatively created the danger to Connie or created "a situation that was more dangerous than the one in which they found her." *See Martinez*, 943 F.3d at 1271.

The only affirmative conduct Plaintiffs allege as to the Doe Employees is that they represented to Connie's neighbors who called 911 that "help was on the way." (FAC ¶ 8.) Specifically, Plaintiffs allege that a Doe Employee responded to a call from an unnamed neighbor at 8:03 p.m. and stated that "they already had another call [about a break-in] but

11

confirmed that it was the door to her complex." (FAC ¶ 61.)  At 8:41 p.m., a Doe Employee "assured the neighbor" that "units were already sent . . . the police would be making contact shortly and they would have a lot of units coming."  (FAC ¶ 65.)  After the Doe Officers had left the scene, a Doe Employee responded to a follow-up call at 11:36 p.m. from a neighbor who expressed concern for her and her children's safety because "the police came and just knocked on the door, but she was watching, and [Chambers] was still inside" Connie's apartment.  (*Id*. ¶ 74.)  The Doe Employee stated that "they needed probable cause to enter the home" and asked if she wanted "wanted the police to reach out."  (*Id*. ¶ 75.)  Although "the neighbor said yes, she would like someone to come by to the scene," no officers came to the scene or called her back.  (*Id*.)

As to the Doe Officers' affirmative conduct, Plaintiffs allege the Doe Officers made "amplified public announcements [which] communicated to neighbors that police were on the scene, that they should stay inside their apartments, and that neighbors should not enter the apartment themselves to try to save Connie."  (*Id*. ¶ 68.)  The Doe Officers knocked on Connie's door with guns drawn, called out on a microphone for individuals in her apartment to come out, and attempted to call Connie on her phone.  (*Id*. ¶¶ 67, 71.)  As a result, Plaintiffs allege that Connie's neighbors did not intervene because they "relied upon the police department and dispatch's representations that help was on the way."  (*Id*. ¶ 8.)

The Doe Defendants' conduct in this case, as pled, does not rise to the level of the officers' actions in *Penilla* and is more akin to that alleged in *Estate of Amos*.  Unlike the officers in *Penilla*, who removed the individual from plain sight and cancelled a request for paramedics, the Doe Defendants did not interact with Connie or impede her access to aid.  Although Plaintiffs contend that "the Doe Employees misled the neighbors by telling them the police [were] on their way when in fact the call had not been upgraded" (Doc. 18 at 4), the Doe Employees did not instruct against, or prohibit individuals from, acting on their own.  The Doe Officers also did not interrupt any ongoing attempts to provide aid, as the only alleged action taken was their decision to respond to the scene.  Such conduct is more passive than in *Estate of Amos* where the officers called off civilians' ongoing, albeit

12

minimal, search efforts.  Nothing in the FAC suggests the Doe Defendants exercised their authority or engaged in conduct that made it difficult, let alone impossible, for anyone to render aid.  Thus, the Doe Employees' statements and the Doe Officers' presence at the scene do not constitute affirmative acts that impeded Connie's access to care.  *Cf. Maxwell*, 708 F.3d at 1082–83 (holding officers increased danger to a gunshot victim by preventing her ambulance from leaving); *Est. of F.R. v. Cnty. of Yuba*, No. 2:23-CV-00846 WBS CKD, 2023 WL 6130049, at *2 (E.D. Cal. Sept. 19, 2023) (finding officers' acts of preventing decedent's family from transporting him to the hospital by blocking their vehicle, "constitute[d] not a mere omission, but affirmative conduct that left [him] in a situation that is more dangerous than the one in which they found him.") (cleaned up).

Moreover, Plaintiffs do not plausibly allege that the Doe Employees' statements and the Doe Officers' presence at the scene created additional danger for Connie because there are no facts to support that the neighbors would have intervened absent such conduct. Plaintiffs maintain that "the neighbors' desire to help is not speculative because the neighbors called multiple times, provided updates, and asked the Doe Employees for updates on the police's status[.]"  (Doc. 18 at 4.)  In the FAC, Plaintiffs allege that the neighbors did not intervene because they "relied upon the police department and dispatch's representations that help was on the way" and they "believed that police would resolve the situation."  (FAC ¶¶ 6, 19.)  At least two neighbors, including Shirazi, called the police multiple times before the Doe Officers arrived at the scene to provide additional information and ask for status updates.  (*See* FAC ¶¶ 52, 54, 57, 64–65.)  Shirazi and one other unnamed female neighbor called again after the Doe Officers had left.  (*Id*. ¶¶ 73–74.)  While the Court does not doubt these neighbors' desire to help Connie, their desire to help Connie, without more, does not raise a reasonable inference that they would have taken action on their own had the Doe Defendants not acted at all.  *Cf. Est. of Amos*, 257 F.3d at 1091 (distinguishing a Seventh Circuit case where "well-equipped and trained would-be rescuers were on the scene and ready to begin rescue efforts when the Deputy Sheriff arrived and ordered them to stop.") (citing *Ross*, 910 F.2d at 1424).

13

Even so, Plaintiffs provide "no reason to believe that their rescue efforts would have been successful had the police not intervened." *Est. of Amos*, 257 F.3d at 1091. Plaintiffs allege that the paramedic who found Connie around 8:20 a.m. the next morning determined she died "semi-recently" (FAC ¶ 82; *see also id*. ¶ 1 ("It was not a quick death or a gentle one.")) and that Chambers was at the scene until the next morning (*id*. ¶¶ 74–76, 79–80). Viewing the facts in the light most favorable to Plaintiffs, the Court infers Connie was likely alive when the Doe Officers arrived at the scene. However, based on the facts alleged, the extent of Connie's injuries throughout the incident remains unknown.

Plaintiffs further claim that Connie's neighbors could have stopped Chambers from inflicting further harm, provided Connie lifesaving medical aid, or taken Connie to the hospital. (Doc. 18 at 5.) The Court first notes that Plaintiffs do not include these as factual allegations in the FAC and therefore does not consider them in determining the sufficiency of Plaintiffs' pleading. *See Marron v. Saha*, Case No.: 19cv1344-BAS (MSB), 2020 WL 2467062, at *3 (S.D. Cal. May 13, 2020) ("Under [Rule] 7(a), a plaintiff's opposition to a motion to dismiss does not constitute pleadings, and thus 'new' allegations raised in a plaintiff's opposition to a motion to dismiss are not considered when resolving a motion to dismiss.") (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018)). Moreover, the facts alleged also do not support these inferences. There is no indication that any of Connie's neighbors possessed medical or safety training to plausibly infer that Connie's neighbors could have stopped Chambers, that they could have provided "lifesaving medical aid," or that they could have taken Connie to the hospital while Chambers remained in her apartment. *See Est. of Amos*, 257 F.3d at 1091.

Accordingly, Plaintiffs do not plausibly allege that the Doe Defendants engaged in affirmative conduct that created or enhanced the danger to Connie by impeding her access to care or preventing individuals from rendering aid themselves.

### 2. Deliberate Indifference

To satisfy the second requirement of the state-created danger doctrine, "the plaintiff must show that the officer acted with deliberate indifference to a known or obvious

14

danger." *Est. of Soakai*, 137 F.4th at 982 (quoting *Martinez*, 91 F.4th at 1028). "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel*, 648 F.3d at 974 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). The standard for "deliberate indifference is even higher than gross negligence—deliberate indifference requires a culpable mental state." *Id.*

"In the context of a state-created-danger claim, deliberate indifference is a subjective standard that requires a plaintiff to allege facts supporting an inference that the official 'recognized an unreasonable risk and actually intended to expose the plaintiff to such risk.'" *Polanco v. Diaz*, 76 F.4th 918, 928 (9th Cir. 2023) (quoting *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160–61 (9th Cir. 2021)); *see Murguia*, 61 F.4th at 1111 ("When assessing non-detainee failure-to-protect claims, [the Ninth Circuit] appl[ies] a purely subjective deliberate indifference test."). In other words, "Plaintiffs must allege facts from which we can plausibly infer that Defendants knew that something was going to happen, but ignored the risk and exposed [the individual] to it anyway." *Est. of Soakai*, 137 F.4th at 984 (quoting *Martinez*, 943 F.3d at 1274) (cleaned up); *see Est. of Weiss v. Cnty. of Riverside*, Case No. 5:24-cv-00766-SSS-DTBx, 2024 WL 5465056, at *2 (C.D. Cal. Dec. 19, 2024) ("[T]o survive a 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts to support a reasonable inference of deliberate indifference.") (citing *Polanco*, 76 F.4th at 928; *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005)).

In *Hernandez v. City of San Jose*, the Ninth Circuit held that deliberate indifference had been sufficiently alleged against police officers who supervised a political rally where attendees were injured after police directed rally attendees into a crowd of protesters. 897 F.3d 1125, 1129–30 (9th Cir. 2018). There, the plaintiffs alleged the officers "were not only aware that [the specific] rallies had drawn violent crowds in the past but had also received reports of violence on the day of the [r]ally and witnessed the violence firsthand during the [r]ally." *Id.* at 1137. The Ninth Circuit found that the officers acted with deliberate indifference by continuing to direct attendees into the mob. *Id.* at 1136.

In the FAC, Plaintiffs allege the Doe Defendants were actually or constructively aware of Chamber's criminal history, of a judge's order for Chambers to stay away from Connie as a condition of his probation, and of prior instances of domestic abuse against Connie, including instructions for officers responding to calls made for Connie's address to send at least three officers, a sergeant, and a K-9 unit. (FAC ¶¶ 91–96.) Plaintiffs also allege the Doe Defendants were actually or constructively aware of the neighbors' calls reporting Chambers' conduct on the day of the incident. (*See id.* ¶¶ 49–66.) The Court reasonably infers the Doe Defendants were aware of the danger that Chambers posed to Connie, including his potential for violence and his violent actions the day of the incident.

The Doe Employees responded to this information by upgrading two calls to a high priority and dispatching officers to the scene. (*Id.* ¶¶ 7, 63, 66.) However, Plaintiffs now allege that Shirazi called the police again at 9:19 p.m. and reported her concern for Connie to a Doe Employee and asked for police assistance. (*Id.* ¶ 73.) Another female neighbor also called at 11:36 p.m., hours after the Doe Officers had left the scene, and informed a Doe Employee that she "was watching" and "knew [Chambers] was still inside." (*Id.* ¶¶ 74–75.) The neighbor confirmed that she wanted police to reach out and that she would like someone to come by the scene but "on information and belief no officers ever came to the scene or called back the neighbor." (*Id.* ¶ 75.) Plaintiffs' factual allegations support a plausible inference that the Doe Employee "knew that something was going to happen" because the Doe Employee was aware of the neighbor's report confirming that Chambers had not left Connie's unit and was also aware that the Doe Officers had not verified Connie or Chambers' location before leaving the scene. *See Est. of Soakai*, 137 F.4th at 984. Still, the Doe Employee ignored the known risk of harm to Connie and failed to dispatch officers.

Like the officers in *Hernandez*, the Doe Officers here knew that Chambers posed an immediate threat to Connie. Specifically, the Doe Officers were not only aware of Chambers' past acts of violence towards Connie but had also received information of his violent behavior on the day of the incident and witnessed firsthand the broken glass from Connie's sliding door that Chambers shattered to enter her unit. Plaintiffs provide

16

additional allegations in the FAC that demonstrate the Doe Officers were aware of the neighbors' reports that Connie was home and that Chambers had not left her apartment. Based on the FAC, Shirazi informed a Doe Employee that she had been monitoring the situation through security camera footage and informed at least one Doe Officer that Connie was home. (FAC ¶¶ 55, 70.) A female neighbor also called 911 to report the break-in and informed a Doe Employee that "she had not seen the man leave since he went inside Connie's apartment" and that she had seen "movement in the living room." (*Id.* ¶¶ 61–62.) In response, the Doe Officers instructed individuals to come out of Connie's apartment and attempted to contact Connie but did not receive a response. (*Id.* ¶¶ 67, 70.)

Although they did not receive a response from Connie or Chambers, and a Doe Employee later represented they did not believe there was "probable cause to enter" Connie's unit (*see* FAC ¶ 75), at a minimum the Doe Officers knew that a break in had occurred. The Doe Officers were also aware of the neighbors' warnings that Connie and Chambers were still at the scene. Despite their knowledge, the Doe Officers did not investigate any further. Instead, they allegedly left the scene 15 minutes after their arrival and did not render aid. *See Hernandez*, 897 F.3d at 1136 (holding that allegations rose to the level of subjective deliberate indifference because defendants were "aware of the danger to the plaintiffs" and yet "continued" their problematic course of conduct). Their actions are therefore distinguishable from those of the teacher in *Patel*, who "did not know there was any *immediate* danger in allowing [the student] to use the bathroom alone." 648 F.3d at 976 (cleaned up).

Considering the facts alleged and drawing all reasonable inferences in favor of Plaintiffs, the Doe Defendants recognized an unreasonable risk of immediate harm to Connie because they knew of Chambers' history of violence towards Connie, they knew that he broke into Connie's apartment the day of the incident, and they were repeatedly warned by the neighbors that Connie and Chambers had not left the scene. Yet, the Doe Defendants disregarded the neighbors' warnings. The Court therefore finds that Plaintiffs sufficiently allege the Doe Defendants acted with deliberate indifference because they

"knew that something was going to happen, but ignored the risk and exposed [Connie] to it anyway." *Est. of Soakai*, 137 F.4th at 984 (quoting *Martinez*, 943 F.3d at 1274). However, because Plaintiffs fail to satisfy the first element, the state-created danger claim nonetheless fails.

### 3. Conclusion

The Court finds that Plaintiffs fail to state a violation of Connie's Fourteenth Amendment due process rights under the state-created danger doctrine. *Martinez*, 943 F.3d at 1271. Additionally, because Plaintiffs have failed to plead a violation of Connie's Fourteenth Amendment due process rights, Plaintiffs have also failed to adequately plead interference with Connie's familial relationships. *See Robbins*, 2006 WL 1716220, at *14 ("Where a claim for interference with familial relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional, a finding that the other conduct was constitutional generally will preclude recovery for interference with familial relationship.") (citing *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004)). Accordingly, the Motion is **GRANTED** as to the Second and Third Causes of Action..

## B. *Monell* Claim (First Cause of Action)[4]

Municipalities cannot be held vicariously liable under § 1983 for the actions of their employees. *Monell*, 436 U.S. at 691. Instead, to state a § 1983 claim against a local governmental entity, a plaintiff must allege that: "(1) [she] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F. 4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).

---

[4] Plaintiffs also assert this claim against the Doe Supervisors. (*See* FAC ¶ 108.) However, by definition, a *Monell* claim is brought against a public entity alone. *See generally Monell*, 436 U.S. 658 (1978). The Court therefore **DISMISSES** the Doe Supervisors from the First Cause of Action **without leave to amend**.

18

Plaintiffs assert a Fourteenth Amendment claim against Defendant CSD under *Monell* for failure to train and unconstitutional policies or customs. (FAC ¶¶ 107–24.) Defendants move to dismiss this claim because Plaintiffs fail to: (1) allege sufficient facts to establish the denial of a constitutional right; (2) plead a custom or policy; and (3) establish a sufficient basis for a failure to train theory. (Doc. 17-1 at 6–15.)

In the MTD Order, the Court previously dismissed the *Monell* claim for failure to allege a constitutional violation. (Doc. 10 at 9–18.) The Court also noted that Plaintiffs did not identify any deficient training programs to support a failure to train claim, did not allege prior instances of constitutional violations to support an unconstitutional custom claim, and failed to explain how Defendants' delayed response time was a moving force behind Connie's death. (*Id*. at 20–22.)

Here, Plaintiffs again fail to identify prior instances of constitutional violations concerning Defendants' delayed response time to priority one calls to support its unconstitutional custom theory. *See Davis v. City of Ellensburg*, 869 F.2d 1230, 1234 (9th Cir. 1989) (holding that one prior instance of unconstitutional conduct is insufficient to constitute a custom).[5] As to Plaintiffs' *Monell* claim based on a failure to train, Plaintiffs contend that two deficiencies in SDPD's training program are "information sharing, and effective and accurate communication" and "handling stalkers and protecting victims from stalkers." (FAC ¶¶ 105–106.) However, Plaintiffs still do not allege "the existence of a pattern of tortious conduct by inadequately trained employees." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407–08 (1997); *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (holding "[p]roof of a single incident of unconstitutional

---

[5] The Court notes that Plaintiffs did not respond to Defendants' arguments concerning Plaintiffs' policy-based claims (*see* Doc. 18 at 5–7) and have thus conceded the issue. *See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.").

activity is not sufficient to impose [municipal] liability" under a failure to train theory).

Notwithstanding such deficiencies, the *Monell* claim necessarily fails solely based on Plaintiffs' failure to plead a constitutional violation (*see* Sec. III.A).  *See Ottaviano v. City of Los Angeles*, Case No. CV 22-2384-DMG (AGRx), 2023 WL 5667569, at *5 (C.D. Cal. July 20, 2023).   Accordingly, the Motion as to the First Cause of Action is **<u>GRANTED</u>**.

### C.    Negligence (Fourth Cause of Action)

Plaintiffs bring a claim for common law negligence against all Defendants.  In the FAC, Plaintiffs re-allege that: (1) the Doe Defendants "had a duty to use reasonable care regarding members of the public" and breached such duty to protect Connie from foreseeable harm from Chambers; and (2) Defendant CSD and the Doe Supervisors are vicariously liable under section 815.2 of the California Government Code.  (FAC ¶¶ 142, 145.)  Defendants argue Plaintiffs fail to state this claim because the Doe Defendants had no special relationship with, and thus did not owe a duty to, Connie.  (Doc. 17-1 at 21–25.)

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury."  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (citations omitted).  As a general rule, "[a] person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act."  *Williams v. State of California*, 34 Cal. 3d 18, 23 (1983).  This duty, or lack thereof, also applies to law enforcement officers.  *See Von Batsch v. Am. Dist. Tel. Co.*, 175 Cal. App. 3d 1111, 1121–22 (1985).

#### 1.    Doe Officers and Doe Employees

Defendants argue that the Doe Defendants did not have a special relationship with Connie giving rise to a duty of care because they did not interact with, or provide any assurances of protection to, Connie and any statements made to her neighbors did not create a special relationship with Connie.  (Doc. 17-1 at 23.)  In their Opposition, Plaintiffs

contend Connie's neighbors made the Doe Defendants aware of "the specific risks Connie faced on that day" and such awareness created a special relationship giving rise to liability. (Doc. 18 at 7 (citing *Ketchum v. Alameda Cnty.,* 811 F.2d 1243, 1247 (9th Cir. 1987)).)

"[T]o prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (citations omitted). "As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." *Williams*, 34 Cal. 3d at 23. "Thus, absent a special relationship creating a special duty, the victim of a crime that the police might have prevented cannot recover." *Von Batsch*, 175 Cal. App. 3d at 1121–22.

A special relationship arises in cases where "some act or omission on the part of the defendant . . . created a risk or increased an existing risk to a known person." *Zepeda v. City of Los Angeles*, 223 Cal. App. 3d 232, 235 (1990). "The breach of duty may be an affirmative act which places the person in peril or increases the risk of harm." *Williams*, 34 Cal.3d at 24. A breach may also occur "if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so." *Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1129 (2002). "In most instances, these general rules bar recovery when plaintiffs, having suffered injury from third parties who were engaged in criminal activities, claim that their injuries could have been prevented by timely assistance from a law enforcement officer." *Id*. (citations omitted).

As in the initial Complaint, Plaintiffs' negligence claim is based on the same alleged conduct as the § 1983 and *Monell* claims. But the Court already determined that Defendants' conduct, as alleged in the FAC, does not constitute an affirmative act that increased the danger posed to Connie (*see* Sec. III.A.3). *See Ottaviano v. City of Los Angeles*, Case No. CV 22-2384-DMG (AGRx), 2023 WL 5667569, at *5 (C.D. Cal. July 20, 2023) ("The Court's conclusions as to the imposition of constitutional tort liability also

apply to the imposition of ordinary tort liability under California law."); *Roark v. Richardson Bay Reg'l Agency*, Case No. 22-cv-07610-WHO, 2023 WL 8360057, at *15 (N.D. Cal. Dec. 1, 2023) (dismissing negligence claim without leave to amend "for the same reasons the state-created danger claim fails."). While Plaintiffs provide specific neighbors' interactions with the Doe Defendants, "[t]he officers' statements to [Connie's] neighbors alone are not enough to create a special relationship with or a duty of care to [Connie]." *Ottaviano v. City of Los Angeles*, No. Case No. CV-22-2384-DMG (AGRx), 2023 WL 8291795, at *2 (C.D. Cal. Oct. 26, 2023). Indeed, as the Court discussed *supra* (*see* Sec. III.A.1), the Doe Defendants did not interact with Connie directly and did not offer special protection to Connie sufficient to establish a special relationship. *See Zelig*, 27 Cal. 4th at 1129 (citations omitted) ("And the circumstance that an officer may have offered special protection on one occasion does not, by itself, give rise to a continuing special relationship and duty at a later date—or with other officers."); *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 279 (1998) ("A long line of cases have held that a special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene."). Thus, Plaintiffs fail to state a negligence claim against the Doe Officers and Doe Employees.

### 2. Defendant CSD and Doe Supervisors

Plaintiffs allege that Defendant CSD and the Doe Supervisors breached their duty of care to Connie by "negligently supervising and training [the Doe Defendants], and negligently maintaining dangerous and unconstitutional policies and procedures and customs." (FAC ¶ 143.) Defendants argue that Plaintiffs' negligence claim fails because they do not "allege facts establishing a special relationship between Decedent and Doe Supervisors." (Doc. 17-1 at 25.)

Under California law, Defendant CSD and the Doe Supervisors cannot be held directly liable for negligent supervision and training. *See de Villers v. Cnty. of San Diego*, 156 Cal. App. 4th 238, 251 (2007) ("We conclude that a direct claim against a governmental entity asserting negligent hiring and supervision . . . may not be

maintained"); *Berman v. Sink*, No. CV F13-0597 LJO SAB, 2013 WL 2360899, at \*16 (E.D. Cal. May 29, 2013) ("There is no dispute that the County is not subject to a direct claim for negligent hiring, retention, supervision, training and staffing.").

In contrast to direct liability, a governmental agency may be held vicariously liable for the torts of employees acting within the scope of their employment. Cal. Gov. Code § 815.2(a). To establish vicarious liability for negligent supervision, a plaintiff must establish that "supervisory and administrative" employees of the government entity "knew or had reason to know of [an employee]'s dangerous propensities and acted negligently in hiring, supervising and retaining [him or] her." *C.A. v. William S. Hart Union*, 53 Cal. 4th 861, 868–69 (2012). As in any action for negligence, the plaintiff must establish that the tortfeasor had a duty of care to the victim, and that the breach of this duty caused the victim's harm. *Id.* at 876.

"An exception for this general standard exists, however, for 'unusual police conduct that creates a 'special relationship' between the police officer and an individual member of the public.'" *Brown v. Metro by T-Mobile*, 768 F. Supp. 3d 1068, 1093 (C.D. Cal. 2024) (quoting *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 276 (1998), *as modified on denial of reh'g* (Jan. 4, 1999). "A long line of cases have held that a special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene." *Id.* (quoting *Adams*, 68 Cal. App. 4th at 279). Cases where courts have imposed a duty of care "involved police officers who made misrepresentations that induced a citizen's detrimental reliance, placed a citizen in harm's way, or lulled a citizen into a false sense of security and then withdrew essential safety precautions." *Id.* (quoting *Adams*, 68 Cal. App. 4th at 279–80) (cleaned up). "Absent such a special relationship, there can be no individual liability to third parties for negligent hiring, retention, or supervision of a fellow employee, and hence no vicarious liability under section 815.2." *William S. Hart Union*, 53 Cal. 4th at 877.

In this case, Plaintiffs do not allege that Connie relied on any misrepresentations or actions taken by Defendants. Nor do Plaintiffs allege any facts demonstrating the Doe

Defendants created "a particular risk or hazard" or that the Doe Supervisors "had prior knowledge of [any of the Doe Defendants'] propensity to do the bad act." *See Philips*, 172 Cal. App. 4th at 1139. Thus, Plaintiffs fail to allege the City or the Doe Supervisors had a special relationship with Connie to give rise to vicarious liability for their subordinates' actions. *See Metro by T-Mobile*, 768 F. Supp. 3d at 1095 ("There can be no cause of action for negligence absent the demonstration of a legal duty or breach.").

### 3. Conclusion

For the same reasons set forth in its MTD Order, Plaintiffs have not sufficiently alleged the existence of a special relationship giving rise to a duty owed by Defendants to Connie.[6] Accordingly, the Motion as to the Fourth Cause of Action is **GRANTED**.

## D. Bane Act (Fifth Cause of Action)

The Bane Act creates a cause of action against any person who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion," with the constitutional rights of an individual. Cal. Civ. Code § 52.1. To state a Bane Act claim, a plaintiff must sufficiently allege (1) a constitutional violation and (2) a specific intent to violate the plaintiff's rights. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 798–801 (2017)). To act with specific intent means "in reckless disregard of constitutional . . . prohibitions." *Cornell*, 17 Cal. App. 5th at 803.

Municipalities may be held vicariously liable under the Bane Act through section 815.2 of the California Government Code, which imposes liability on counties under *respondeat superior* for the acts of county employees. *See Cameron v. Craig*, 713 F.3d 1012, 1023 (9th Cir. 2013) ("California has rejected the *Monell* rule . . . [instead,] state law

---

[6] As Plaintiffs fail to allege that Defendants owed Connie a duty, the Court does not reach Defendants' remaining arguments concerning the applicability of qualified immunity as to the Doe Employees. (*See* Doc. 17-1 at 24–25.) The Court further notes that Plaintiffs failed to address, and thereby waived, such arguments. *See Stichting Pensioenfonds ABP*, 802 F. Supp. 2d at 1132.

24

imposes liability on counties under the doctrine of *respondeat superior*.") (cleaned up).

Plaintiffs assert a Bane Act claim against Defendant CSD, the Doe Officers, and the Doe Employees based on the same facts supporting the Fourteenth Amendment claims. (*See* FAC ¶¶ 146–53.)  Plaintiffs allege that "Connie had a constitutional right to be free from state-created danger."  (*Id*. ¶ 148.)  Defendants move to dismiss this claim, arguing that the FAC does not contain any factual allegations regarding threats, intimidation, or coercion of Connie or any Defendants' specific intent to violate her rights.  (Doc. 17-1 at 27.)  Plaintiffs respond that Defendants acted with specific intent by misleading and preventing Connie's neighbors from going to her aid.  (Doc. 18 at 5, 8.)  However, "while Plaintiff[s] may rely on the same factual allegations upon which [they] base[ ] [their] Fourteenth Amendment claims, where the federal claim is deficient and the Bane Act claim relies upon the federal constitutional violation as its foundation, the Bane Act claim also fails."  *Cheslik v. Madera Cnty. Sheriff's Dep't*, No. 1:23-CV-01754 JLT BAM, 2025 WL 974082, at *11 (E.D. Cal. Mar. 31, 2025).  For the same reasons that Defendants' alleged conduct did not amount to a violation of Connie's constitutional rights (*see* Sec. III.A.1), Plaintiffs also fail to state a claim under the Bane Act.  *See Reese*, 888 F.3d at 1045.  Accordingly, the Motion as to the Fifth Cause of Action is **<u>GRANTED</u>**.

### E.   State Law Immunity

Defendants contend that the Doe Defendants are entitled to immunity for their alleged actions under California Government Code §§ 820.2, 845, 846, and that Defendant CSD is immune under § 815.2(b).  (Doc. 17-1 at 26–28.)  Because the Court has not found constitutional or state law violations, it need not address Defendants' arguments concerning the Doe Employees and the Doe Officers' immunity.

### F.   Leave to Amend

Defendants request that the Motion be granted without leave to amend.  (Doc. 17-1 at 29–30.)  Plaintiffs do not respond to this argument.

Rule 15(a) provides that a district court should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a).  In deciding whether justice requires granting

leave to amend, factors to be considered include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "A district court may deny a plaintiff leave to amend if it determines that 'allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency,' or if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (cleaned up).

Because the Court is not certain that the pleading deficiencies "could not possibly be cured," the Court **GRANTS** Plaintiffs a final opportunity to amend.

### IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant CSD's Motion (Doc. 17) with leave to amend. Plaintiffs may file a second amended complaint on or before **September 19, 2025**.

**IT IS SO ORDERED.**

DATE: August 28, 2025

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE